Martin D. McLean, WSBA No. 33269
Jessica Thompson, WSBA No. 48827
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
martym@hbsslaw.com
jessicat@hbsslaw.com

Russell M. Aoki, WSBA No. 15717
Isham M. Reavis, WSBA No. 45281
**AOKI LAW PLLC**
1200 Fifth Avenue, Suite 750
Seattle, WA 98101
Telephone: (206) 624-1900
russ@aokilaw.com
isham@aokilaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| ROZA AYDIN, Personal Representative of the Estate of Ismail Mamatov,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF ISSAQUAH, a Washington municipal corporation, SOUTH CORRECTIONAL ENTITY ("SCORE"), a Governmental Administrative Agency, DEVON SCHRUM, individually and in his capacity as SCORE Executive Director, SCORE JOHN DOES 1–10, individually and in their capacity as employees of SCORE, CYDNE KENNEDY, a nurse, and WELLPATH JOHN DOES 1–10, individually and in their capacity as agents of SCORE.<br><br>Defendants. | Case No.<br><br>**COMPLAINT DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

**Page**

I. FACTS ........................................................................................................................ 2

    A. Ismail Mamatov's incarceration, overdose, and death .................................... 2

    B. SCORE is in the business of cut-rate incarceration. ....................................... 4

    C. Issaquah Jail was on notice of the potential harm associated with its faulty intake and discharge training and practices. ............................. 5

    D. SCORE was on notice of the potential harm associated with its faulty training and practices. ............................................................. 5

II. JURISDICTION AND VENUE .................................................................................. 6

III. PARTIES .................................................................................................................... 6

    A. Plaintiffs And Beneficiaries ............................................................................. 6

    B. Defendant City of Issaquah .............................................................................. 7

    C. Defendant SCORE ........................................................................................... 7

    D. SCORE Employee Defendants ........................................................................ 7

    E. Wellpath Employee Defendants ...................................................................... 9

    F. General Allegations Regarding Parties .......................................................... 10

IV. LIABILITY ............................................................................................................... 11

    A. General Allegations Regarding the Duties of Corrections Officers .............. 11

FIRST CLAIM FOR RELIEF Common Law Negligence *Against All Defendants* ........... 11

SECOND CLAIM FOR RELIEF Civil Rights Claim for Cruel and Unusual Punishment and Denial, Delay, and Withholding of Medical Care *Against SCORE Employee Defendants* ........................................................................ 12

THIRD CLAIM FOR RELIEF Civil Rights Claim for Cruel and Unusual Punishment and Denial, Delay, and Withholding of Medical Care *Against SCORE* ......................................................................................................... 12

FOURTH CLAIM FOR RELIEF Civil Rights Claim for Cruel and Unusual Punishment and Denial, Delay, and Withholding of Medical Care *Against Wellpath Employee Defendants* ................................................................... 13

| | | |
|---|---|---|
| V. | JOINT LIABILITY | 13 |
| VI. | DAMAGES | 13 |
| VII. | JURY DEMAND | 14 |
| VIII. | COMPLIANCE WITH CLAIM FILING STATUTES | 14 |
| IX. | PRAYER FOR RELIEF | 14 |

1. For almost a century, Washington courts have recognized that jailers have the duty to ensure an inmate's health, welfare, and safety.

2. In 1918, the Washington Supreme Court held that a sheriff running a county jail owed "the direct duty to a prisoner in his custody to keep him in health and free from harm." *Kusah v. McCorkle,* 100 Wash. 318, 325, 170 P. 1023 (1918).

3. This duty positive duty arises out of the special relationship formed when the jailer has complete control over a prisoner deprived of liberty. *Shea v. City of Spokane,* 17 Wn. App. 236, 242, 562 P.2d 264 (1977), *aff'd,* 90 Wn.2d 43, 578 P.2d 42 (1978). A jailer cannot delegate this duty. Nor can a prisoner assume the risk or contribute to a jailer's negligence. *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 638, 643 (2010).

4. The jailer's nondelegable affirmative duty to protect prisoners from harm includes a duty to prevent the prisoner from self-harm, whether by suicide or drug overdose. *Anderson v. Grant Cnty.*, 28 Wn. App. 2d 796, 809 (2023). It also includes an affirmative, non-delegable duty to prevent the entry of controlled substances into a facility. *Id.*

5. The instant case falls under the rubric of *Kusah*, *Shea*, *Gregoire*, and *Anderson*. On June 27, 2023, Ismail Mamatov was found dead in his cell at SCORE jail with a packet of fentanyl and methamphetamines in the shirt pocket of his jail uniform. Just 18 hours earlier, he had been released from Issaquah jail, high on fentanyl, with those drugs in his pocket.

6. The City of Issaquah Jail failed to prevent the entry of narcotics into their facilities. This allowed Mamatov to obtain and transport drugs from Issaquah Jail to SCORE. SCORE guards then failed to search Mamatov and left him unsupervised while he transferred drugs from his civilian clothing to his jail uniform.

7. After that, Mamatov proceeded to an intake interview where he disclosed that he was under the influence of fentanyl. Mamatov was returned to his cell with drugs in his jail shirt pocket. Within hours, he would consume those drugs, overdose, and die.

8. Mamatov had been to SCORE multiple times before his death in June 2023. SCORE records noted that he suffered from fentanyl addiction.

COMPLAINT FOR DAMAGES - 1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX
003353-11/2530874 V2

9. The root cause of Ismail Mamatov's death was a system that did not care about him because he was a drug addict.

10. Plaintiff brings this action under 42 U.S.C. §1983 for violations of the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution. Plaintiff also brings various state and common law claims.

## I.   FACTS

**A.   Ismail Mamatov's incarceration, overdose, and death.**

1. On June 26, 2023, Ismail Mamatov was discharged from Issaquah Jail where he had spent 133 days in custody. He was placed into his civilian clothes, which contained a packet of fentanyl and methamphetamine.

2. Months prior, when placing Mamtov's civilian clothing into his personal property, Issaquah officers searched certain items of his clothing and found 10 fentanyl pills. There is no record of Issaquah Jail searching the remainder of Mamatov's civilian clothes for drugs or any other paraphernalia before, during, or after his incarceration there.

3. Mamatov arrived at SCORE jail at approximately 10 PM on June 26, 2023, with drugs in the waistband of his civilian clothing. SCORE officers began intake. Surveillance footage showed that Mamatov was left standing alone by the Corrections Officer who was supposed to be searching him. The officer walked over to the main counter, giving Mamatov the opportunity to take the package of drugs out of the waistband of his civilian clothes and transfer it first to his mouth and then later to a ledge in the changing area.  Mamatov donned his new jail clothes and concealed the drugs in his jail clothing.

4. At 4 AM on June 27, Mary Kinyati, a staff nurse for Wellpath (SCORE's healthcare contractor) interviewed Mamatov about his drug use. Mamatov indicated that he had taken fentanyl the day prior (while in custody of Issaquah jail) and that he was currently withdrawing. Mamatov also had positive urinalysis results for amphetamine and methamphetamine and fentanyl. He was flagged for "Active Withdrawal" by the interviewer.

5. Jail staff ordered monitoring for Mamatov using The Clinical Opiate Withdrawal Scale (COWS). COWS is an 11-item scale designed to be administered by a clinician. This tool

can be used in both inpatient and outpatient settings to rate common signs and symptoms of opiate withdrawal and monitor these symptoms over time. The total score for the complete scale can be used to help clinicians determine the stage or severity of opiate withdrawal and assess the level of physical dependence on opioids. Jail staff were supposed to conduct a COWS assessment with vital signs every 8 hours for 5 days. They were also supposed to offer Mamatov Meclizine, Loperamide, and Acetaminophen during these assessments to aid in his withdrawal symptoms.

6. Mamatov was placed in his cell at the conclusion of his intake interview. At around 7 AM, a SCORE surveillance camera showed that he snorted something. Shortly after, another inmate noticed that Mamatov was an unusual color and had blood coming out of the side of his mouth.

7. Between 11:30 AM–12 PM, Mamatov's cellmate observed that Mamatov "moved slightly and mumbled but did not wake up." Jail staff observed the same behavior when they brought his lunch. Instead of checking on his welfare, corrections officers simply left his food there.

8. Because Mamatov had been flagged as "Active Withdrawal," he should have had a COWS assessment around this time (every 8 hours per jail records, which in this case was at 12 PM). But by 12:28 PM, detox rounds had not yet completed. Fellow inmate Grant had tried to wake Mamatov at that time, but he only mumbled and did not wake up or respond with an audible response.

9. At approximately 3 PM, an inmate worker knocked on the primary door of the N5 POD where Mamatov was being housed, informing Ofc. M. Roosa that an inmate located in N5-08 was not moving and unresponsive. Mamatov had no pulse and was cold to the touch. Jail staff called 911 and administered Narcan, CPR, oxygen, and electronic defibrillation. First responders arrived and continued life saving measures, but it was too late. Mamatov was pronounced dead at 3:22 PM.

10. SCORE staff did not conduct proper welfare checks or COWS assessments. Welfare checks that did actually occur were conducted in an indifferent and ineffectual

manner. For example, a Wellpath nurse Cydne Kennedy logged an entry claiming that a COWS assessment of Mamatov was completed after he was pronounced dead. RN Kennedy reported that Mamatov had a pulse of 98 beats per minute at 3:41 PM, at which time he had been dead for at least 20 minutes.

11. The next day the King County Medical Examiner performed an autopsy to confirm cause of death. Cause of death was acute combined drug intoxication including fentanyl and methamphetamine. The examiner found a baggy of suspected drugs in Mamatov's right front pocket. The suspected drugs tested positive for fentanyl and methamphetamine.

**B.   SCORE is in the business of cut-rate incarceration.**

12. Although SCORE is technically a governmental administrative agency, it provides contract jail services to numerous municipalities in a manner akin to a for-profit business. As a result, SCORE operates under the perverse economic incentives of a for-profit jail. SCORE cut corners and make staffing policies and medical decisions based on their financial interests—not the health of their inmates.

13. Inmate healthcare at SCORE is contracted to Wellpath, the nation's largest prison healthcare company. Wellpath is a for-profit corporation that provides medical services to jails and prisons nationwide and markets itself as a cheaper alternative to in-house medical departments.

14. A well-publicized investigation of Wellpath in 2019 exposed substandard care that led to deaths and other serious outcomes that could have been avoided. The investigation highlighted deaths and near-death experiences of a number of inmates at nearly 120 locations in 32 states showing how doctors and nurses failed to diagnose and monitor life-threatening illnesses, denied urgent emergency room transfers, and allowed common infections and conditions to become fatal.

15. The investigation found that officials in one county terminated Wellpath's contract after less than two years, calling the company's performance "morally reprehensible." Another county reported that Wellpath's failures had turned its jail into a sinking submarine.

16. Investigators also found that workers from multiple Wellpath facilities had shredded medical requests or hid them in boxes because of a lack of staff and resources.

17. This 2019 review of lawsuits filed over the previous five years found that the company had been sued for more than 70 deaths.

18. SCORE administrators and decision-makers knew or should have known of Wellpath's history of deliberate indifference when it contracted with Wellpath for services.

C. **Issaquah Jail was on notice of the potential harm associated with its faulty intake and discharge training and practices.**

19. Issaquah jail was on notice at the time of Mamatov's death of the potential for harm enabled by its deficient practices, training, and supervision, due to previous specific incidents involving Issaquah jail inmates.

20. Issaquah Jail knew that fentanyl was being trafficked into its facilities and abused by inmates at the time of Mamatov's incarceration.

21. In 2023, at least two people died while in custody at the Issaquah jail of fentanyl overdoses. According to the King County Medical Examiner's Office, Kevin Wiley, a 43-year-old man, and 48-year-old David McGrath both died of acute fentanyl intoxication.

D. **SCORE was on notice of the potential harm associated with its faulty training and practices.**

22. SCORE was on notice at the time of Mamatov's death of the potential for constitutional violations enabled by its deficient practices, training, and supervision, due to previous specific incidents involving SCORE and internal reporting by staff that SCORE's practices were deficient.

23. For example, Lisa Rogers, a registered nurse for 27 years, worked the night shift at SCORE between March 2022 and October 2022 as an employee of Wellpath. "It was the most unprofessional place I've ever worked in my life," Rogers said of SCORE. "It was filthy, and the people were very unprofessional in the way that they spoke [and] the way that they made decisions based on patient care."

24. Rogers said she had little assistance caring for the more than 400 people incarcerated at SCORE. Guards and other staff pressured her to treat people in the jail as inmates

COMPLAINT FOR DAMAGES - 5

rather than patients, she said. "It was not quality nursing. It was *quantity* nursing." Rogers recalled being told to "just page through" new inmates' three-page intake form without seriously assessing people. "They're just trying to get people booked as quickly as they can," she said.

25. Rogers described seeing a patient who was in withdrawal from fentanyl who had defecated on herself and was left in filthy clothing for three days. "I decided to get her set up with a shower and actually physically help her get up because she was so sick," Rogers said.

26. Rogers said she raised issues with supervisors about the poor quality of care at SCORE, but was repeatedly ignored or rebuffed. Shortly after raising these issues, she was fired.

27. SCORE was well aware of numerous deficiencies in the manner in which they provided medical care, including but not limited to: inadequate staffing levels, failure to perform welfare checks, the failure to staff qualified medical providers (physicians and nurse practitioners), and the tendency of employees to retroactively forge records for treatment that did not actually occur. Mamatov's death was caused in part by materially similar omissions.

## II.   JURISDICTION AND VENUE

28. This Court has jurisdiction over Plaintiff's claims under the Fourteenth Amendment of the U.S. Constitution.

29. Plaintiff's state and federal claims arise from a common nucleus of operative facts. Therefore, this court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. §1367.

30. Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

## III.   PARTIES

**A.   Plaintiffs And Beneficiaries**

31. Plaintiff Roza Aydin is the duly appointed and acting Personal Representative of the Estate of Ismail Mamatov. This appointment was made in King County on November 17, 2023. Ismail Mamatov was an individual who was a resident of Federal Way, King County, Washington. Ismail was pronounced dead on June 27, 2023. Plaintiff Aydin brings this action as Personal Representative for the benefit of Ismail Mamatov's estate and all beneficiaries and

persons entitled to recovery pursuant to wrongful death, survival and personal injury laws of the State of Washington, including but not limited to, RCW 4.20.010, 4.20.020, 4.20.046, and 4.20.060, or under any body of foreign law of damages the Court rules applicable to these claims.

**B.     Defendant City of Issaquah**

32.    Defendant City of Issaquah is an incorporated city located in King County, Washington.

33.    The City of Issaquah operates a Central Jail and Dispatch Center at 130 E Sunset Way, in Issaquah, Washington.

34.    Under the doctrine of *respondeat superior*, the City of Issaquah is liable for the conduct of its employees, which at all relevant times was within the course and scope of their employment.

35.    At all relevant times, the City of Issaquah held persons in custody under the color of state law.

**C.     Defendant SCORE**

36.    Defendant South Correctional Entity ("SCORE") is a governmental administrative agency established pursuant to RCW 39.34.030(3).

37.    SCORE's primary purpose is operating a jail in Des Moines, Washington. SCORE provides correctional services to its member cities, which include Auburn, Burien, Des Moines, Federal Way, Renton, SeaTac, and Tukwila, as well as providing contract services to numerous other governmental entities and agencies.

38.    Under the doctrine of *respondeat superior*, SCORE is liable for the conduct of its employees and agents, including Wellpath and Wellpath employees, which at all relevant times was within the course and scope of their agency.

39.    At all relevant times, SCORE held persons in custody under the color of state law.

**D.     SCORE Employee Defendants**

40.    The individuals listed in paragraphs 41-47 are collectively referred to as "SCORE Employee Defendants." All are sued in their individual capacity.

41. SCORE director Devon Schrum Defendant is an individual who is a resident of Washington. Mr. Schrum was the Executive Director of SCORE at all relevant times. Mr. Schrum was ultimately responsible for the day-to-day operations of the facility, including but not limited to the provision of medical care and the prevention of controlled substances from entry into the facility. It is believed and therefore alleged that his responsibilities included personally reviewing or designating another individual to review the policies and procedures related to intake and booking of inmates, including the policies and procedures related to searching inmates for controlled substances. His responsibilities also included, but were not limited to, personally reviewing or designating another individual to be responsible for handling and developing policies and procedures related to all clinical issues within the jail; selecting and contracting with the healthcare provider Wellpath; assuring the delivery of effective health care; establishing written agreements with outside specialty health care services for emergency and urgent care that is not available within the facility; establishing protocols for use by medical staff during medical screening; developing medical screening forms; oversee the transfer of inmates for medical treatment.

42. Defendant SCORE Doe 1 is an individual who is believed and therefore alleged to be a resident of Washington State. SCORE Doe 1 is the Deputy Executive Director of SCORE, who is primarily responsible for providing general management and had general management control over the jail. SCORE Doe 1 is responsible for selecting training topics; establishing a training committee; determining when employees should be terminated or suspended; and reviewing in-custody deaths.

43. Defendant SCORE John Doe 2 is an individual who is believed and therefore alleged to be a resident of Washington State. SCORE John Doe 2 is the Training Lieutenant for SCORE. SCORE John Doe 2's responsibilities include, but are not limited to, ensuring that all staff members are properly trained to perform all duties and responsibilities and maintaining training records.

44. Defendant SCORE John Doe 3 is an individual who is believed and therefore alleged to be a resident of Washington State. SCORE John Doe 3 is the Command Duty Officer

on call while Ismail was at SCORE. As the Command Duty Officer, SCORE John Doe 3 was continuously available to ensure an adequate level of assistance and direction for on-shift supervisors.

45. SCORE John Does 4-10 are individuals residing in Washington State and employed by SCORE, at all relevant times.

46. At all relevant times, the SCORE Employee Defendants were employed by SCORE and acting within the course and scope of their employment and under color of state law.

47. Defendants SCORE John Does 4-10 are individuals employed by SCORE to administer, operate, and/or manage SCORE's jail facility. At all relevant times, they were acting within the course and scope of their employment and under color of state law.

**E.     Wellpath Employee Defendants**

48. The defendants listed in paragraphs 49-53 are collectively referred to as "Wellpath Employee Defendants." All are sued in their individual capacity.

49. Defendant Wellpath John Doe 1 is an individual who is a resident of Washington State. Wellpath John Doe 1 was Wellpath's "Responsible Physician" assigned to SCORE, at all relevant times. As the Responsible Physician, Wellpath John Doe 1 was ultimately responsible for all of Wellpath's services at SCORE. Wellpath John Doe 1's duties included, but were not limited to, updating and reviewing Wellpath policies, conducting an annual audit of Wellpath's healthcare services at SCORE, holding regular meetings with SCORE's Executive Director, overseeing monthly statistical reports, maintaining Wellpath's health services manual, drafting an appropriate staffing plan for medical personnel, overseeing the admission of medication, and being generally available to address all medical or mental health issues that were beyond the capacity of the Wellpath employees on staff at SCORE.

50. Defendant Wellpath John Doe 2 is an individual who is a resident of Washington State. Wellpath John Doe 2 was Wellpath's Health Services Administrator at all relevant times. Wellpath John Doe 2 was the top Wellpath administrator at SCORE. Wellpath John Doe 2 was responsible for directing, managing, evaluating operations to ensure that contractual obligations

COMPLAINT FOR DAMAGES - 9

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX
003353-11/2530874 V2

and client expectations are met; assuring all operations are in compliance with contract requirements, National Commission on Correctional Health Care ("NCCHC"), American Correctional Association, National Clinical Practice Guidelines, and professional nursing standards; screening, hiring, and training medical staff at SCORE; conducting administrative reviews of in custody deaths; regularly meeting with the Executive Director and shift captains and submitting reports regarding the effectiveness of Wellpath's health care; prioritizing health care services and making triage decisions; determining and facilitating specialty and emergency health care that is beyond the resources available at SCORE; notifying an inmate's next of kin in cases of serious illness and injury; overseeing inmate screening procedures and decisions; overseeing initial health appraisals; developing medical screening forms; developing and maintaining nursing protocols; and developing and maintaining an infirmary manual.

51. Defendant Wellpath John Doe 3 is an individual who is a resident of Washington State. Wellpath John Doe 3 is Wellpath's Director of Nursing at SCORE. He reports directly to the Health Services Administrator and is responsible for supervising all nursing care provided by Wellpath at SCORE.

52. Defendant Licensed Practical Nurse Cydne Kennedy is an individual who is a resident of Washington State. Kennedy was a licensed practical nurse employed by Wellpath and assigned to SCORE at all relevant times. At all relevant times, she was acting within the course and scope of her agency and under color of state law.

53. Defendants Wellpath John Does 4-10 are individuals contracted by SCORE to provide, design, or manage medical and/or mental health services to at SCORE. At all relevant times, they were acting within the course and scope of their agency and under color of state law.

**F.    General Allegations Regarding Parties**

54. The true names and identities of "John Doe" Defendants, whether individual, corporate, or otherwise, are unknown to Plaintiff at this time. Plaintiff will amend this complaint to allege the true names and identities of said defendants, and the basis for said Defendants' liability to Plaintiff, when this information is ascertained.

55. All pronouns and other indications of gender are meant to be nonspecific and interchangeable.

## IV.   LIABILITY

**A.   General Allegations Regarding the Duties of Corrections Officers**

56. Where a corrections officer observes another corrections officer engaging in an act or omission that is physically dangerous or constitutionally violative, each and every law enforcement officer has an independent legal—and moral—duty to intervene, regardless of the chain of command.

**FIRST CLAIM FOR RELIEF**

**Common Law Negligence**
*Against All Defendants*

57. Plaintiff alleges a common law negligence claim against all Defendants. All Defendants had a duty of reasonable care to Ismail, breached that duty, and proximately caused Plaintiff's damages. Additional allegations regarding individual Defendants are included in the subsections below.

58. Ismail was held in custody by City of Issaquah, SCORE and the SCORE Employee Defendants with the contractual assistance Wellpath Employee Defendants. Once Mamatov was in custody—and therefore deprived of liberty and the ability to care for herself—a special relationship existed and Defendants had an affirmative duty to protect Mamatov from harm. This duty was non-delegable.

59. The nursing, medical, and mental health care provided by Wellpath Employee Defendants while at SCORE—or the lack thereof—was below the standard of care expected of the average, competent, provider in the class that the providers belonged and in the same or similar circumstances.

60. Defendants failed to institute policies, procedures, and training that was necessary to assure the safety of inmates. These omissions materially contributed to the errors and omissions of SCORE's and Wellpath's employees.

61. SCORE and the City of Issaquah failed to train employees in a manner necessary to assure the safety of its inmates, and had notice that their deficient training could have potentially catastrophic effects for inmates. These omissions materially contributed to the errors and omissions of SCORE's and Wellpath's employees.

62. The above described actions and omissions were negligent, grossly negligent, reckless, and malicious and breached Defendants' duties to Mamatov.

63. SCORE had actual or constructive notice of Wellpath's history of substandard medical care, in custody deaths, and constitutional violations and was negligent in its hiring of Wellpath.

64. The above described actions and omissions proximately caused Plaintiff's damages.

## SECOND CLAIM FOR RELIEF

**Civil Rights Claim for Cruel and Unusual Punishment and
Denial, Delay, and Withholding of Medical Care**
*Against SCORE Employee Defendants*

65. 42 U.S. §1983 and the Fourteenth Amendment to the U.S. Constitution protect pretrial detainees from punishment. The Fourteenth Amendment also provides pretrial detainees rights equal to or greater than the rights afforded under the Eighth Amendment's right to be free from cruel and unusual punishment, including the deprivation of minimal civilized necessities.

66. SCORE Employee Defendants were deliberately and recklessly indifferent to Ismail's serious medical needs in violation of Ismail's Fourteenth Amendment rights.

67. These acts and omissions conducted by SCORE Employee Defendants were conducted within the scope of their employment with SCORE and under the color of law.

## THIRD CLAIM FOR RELIEF

**Civil Rights Claim for Cruel and Unusual Punishment and
Denial, Delay, and Withholding of Medical Care**
*Against SCORE*

68. 42 U.S. §1983 and the Fourteenth Amendment to the U.S. Constitution protect pretrial detainees from punishment. The Fourteenth Amendment also provides pretrial detainees

rights equal to or greater than the rights afforded under the Eighth Amendment's right to be free from cruel and unusual punishment, including the deprivation of minimal civilized necessities.

69. SCORE's insufficient policies, procedures, and training constitute deliberate indifference to the rights of SCORE inmates.

70. These acts and omissions were conducted under the color of law.

**FOURTH CLAIM FOR RELIEF**

**Civil Rights Claim for Cruel and Unusual Punishment and Denial, Delay, and Withholding of Medical Care**
*Against Wellpath Employee Defendants*

71. 42 U.S. §1983 and the Fourteenth Amendment to the U.S. Constitution protect pretrial detainees from punishment. The Fourteenth Amendment also provides pretrial detainees rights equal to or greater than the rights afforded under the Eighth Amendment's right to be free from cruel and unusual punishment, including the deprivation of minimal civilized necessities.

72. Wellpath Employee Defendants were deliberately and recklessly indifferent to Ismail's serious medical needs in violation of Ismail's Fourteenth Amendment rights and deprived him of minimal civilized necessities.

73. These acts and omissions conducted by Wellpath Employee defendants were conducted within the scope of their agency relationship with SCORE and under the color of law.

**V.   JOINT LIABILITY**

74. Defendants are jointly and severally liable to Plaintiff for their conduct. Further, Defendants were acting in concert and/or acting as agents or servants of each other.

**VI.   DAMAGES**

75. The above described actions and omissions proximately caused Plaintiff's damages, and entitle Plaintiff to monetary relief including compensatory damages, punitive damages, and attorneys' fees and costs.

76. This action is brought for the wrongful death of Ismail Mamatov, and for the Estate of Ismail Mamatov, and for the losses of all wrongful death beneficiaries pursuant to Washington state law, including damages for mental and physical emotional distress, anguish, anxiety and loss of Ismail Mamatov's love, care, comfort, society, and companionship and for

services and support; and for Ismail Mamatov's general damages including anxiety and fear arising out of the peril to which Ismail Mamatov was subjected, and Ismail Mamatov's awareness of his impending death, along with his mental and physical pain and suffering arising from the impact and severe trauma experienced by him; and for the destruction of Ismail Mamatov's earning capacity and financial loss to his estate and the beneficiaries; funeral expenses and loss of personal property; and for the losses to his surviving beneficiaries and all other wrongful death beneficiaries, all pursuant to the Wrongful Death and General and Special Survival Statutes of the State of Washington and any other wrongful death and survival damages available under any other applicable law.

77. This action is brought pursuant to 42 U.S.C. §1983 and §1988, and Plaintiff is therefore entitled to all compensatory damages, punitive damages, costs, and attorneys' fees allowed under federal and state law.

### VII.   JURY DEMAND

78. Plaintiff hereby requests a jury trial in this matter.

### VIII.   COMPLIANCE WITH CLAIM FILING STATUTES

79. Plaintiff and their counsel have fully complied with RCW Ch. 4.92, as applicable, to bring this action. More than 60 days have elapsed since filing of the claims, which have not been accepted by the applicable Defendants.

### IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff having stated their cases, pray for judgment against the abovenamed Defendants, as follows:

A. For special damages in an amount to be proven at the time of trial for loss of support of all beneficiaries of the Estate of Ismail Mamatov occasioned by the wrongful death of Ismail Mamatov;

B. For special damages for destroyed income and earning capacity of Ismail Mamatov occasioned by his death and the economic loss to his estate caused by her premature death;

C. For general damages for all wrongful death beneficiaries of Ismail Mamatov for loss of love, care, comfort, society, companionship, loss of services and support, and family guidance, past and future;

D. For general damages for the pain and suffering preceding and occasioning the death of Ismail Mamatov, including his knowledge and awareness of impending doom;

E. For the mental distress and grief suffered by Ismail Mamatov's beneficiaries, and for their loss of love, care, comfort, society, companionship, loss of services and support, and family guidance, past and future occasioned by Ismail's death;

F. For funeral and burial expenses;

G. For punitive damages against Defendants sufficient to punish them and to deter further wrongdoing;

H. For all other general and special damages recoverable under Washington state law, or any other law deemed applicable by the Court;

I. For pre- and post-judgment interest;

J. The maximum amount of statutory damages allowed, pursuant to RCW 42.56.550(4);

K. For costs, including reasonable attorney's fees allowed by law; and

L. For such other further relief as the Court deems just and equitable.

COMPLAINT FOR DAMAGES - 15

003353-11/2530874 V2

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

| | | |
|---|---|---|
| 1 | DATED: March 21, 2025. | Respectfully submitted, |
| 2 | | |
| 3 | | By  /s/ *Marty McLean* |
| | | Martin D. McLean, WSBA No. 33269 |
| 4 | | Jessica Thompson, WSBA No. 48827 |
| 5 | | **HAGENS BERMAN SOBOL SHAPIRO LLP** |
| | | 1301 Second Avenue, Suite 2000 |
| 6 | | Seattle, WA 98101 |
| | | Telephone: (206) 623-7292 |
| 7 | | martym@hbsslaw.com; |
| | | jessicat@hbsslaw.com |
| 8 | | |
| 9 | | By  /s/ *Russell M. Aoki* |
| | | Russell M. Aoki, WSBA No. 15717 |
| 10 | | Isham M. Reavis, WSBA No. 45281 |
| 11 | | **AOKI LAW PLLC** |
| | | 1200 Fifth Avenue, Suite 750 |
| 12 | | Seattle, WA 98101 |
| | | Telephone: (206) 624-1900 |
| 13 | | russ@aokilaw.com |
| | | isham@aokilaw.com |
| 14 | | |
| 15 | | *Attorneys for Plaintiff* |